UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TIMOTHY A. KILLIANY,

    Plaintiff,

vs.

                                  Civil Action 2:10-cv-00672
                                  Judge James L. Graham
                                  Magistrate Judge E.A. Preston Deavers

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Plaintiff, Timothy A. Killiany, brings this action under 42 U.S.C. §§405(g) and 1383(c)(3) for review of the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income. Plaintiff filed his application for disability insurance benefits on August 17, 2004, alleging that he has been disabled since July 31, 2004, due to a variety of conditions including diabetic neuropathy, severe pain in his feet, chest pain from heart attacks and stents, and the inability to use his right hand. (R. at 65–67, 89.) Plaintiff's applications were denied initially and again upon reconsideration. Plaintiff requested a *de novo* hearing before an administrative law judge ("ALJ").

On November 14, 2007, ALJ Daniel R. Shell held a hearing at which Plaintiff, represented by counsel, appeared and testified. Medical and vocational experts also appeared and testified. On June 18, 2008, the ALJ issued a decision finding that Plaintiff was not disabled

within the meaning of the Social Security Act. (R. at 24–33) In June 2010, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–5.) Plaintiff then timely commenced the instant action.

This matter is before the Magistrate Judge for a report and recommendation on Plaintiff's Statement of Errors and the Commissioner's Memorandum in Opposition. In his Statement of Errors, Plaintiff maintains that the ALJ erred in weighing the opinions of Plaintiff's treating physicians and evaluating other medical evidence that supported his claim. Plaintiff further maintains that the ALJ's hypothetical questions to the vocational expert did not accurately portray his impairments. For the reasons that follow, it is **RECOMMENDED** that the Court **REMAND** this decision to the Commissioner for further consideration consistent with this Report and Recommendation.

## II. PLAINTIFF'S TESTIMONY

Plaintiff, who was forty-seven years old at the time of the November 2007 administrative hearing, has a high-school equivalent education, or GED. (R. at 519.) He has previous work as a welder and auto body repairman. (*Id.*)

At the hearing Plaintiff testified that his doctors first diagnosed him with diabetes when he was seven years old. (R. at 520.) He noted having problems with his blood sugar without any warning and experiencing diabetic comas in the past. (*Id.*) Plaintiff cited one example of when he had "blacked out" at a funeral. (*Id.*) Plaintiff later testified that since he stopped working he has periods, sometimes two to three times per week, where his blood sugar makes him incapable of doing anything. (R. at 543–44.) At the time of the hearing, Plaintiff had been in a wheelchair for a little under a year. (R. at 520.) In assessing the affects of his diabetes, Plaintiff noted that

he has no feeling in his hands or feet and that one foot is amputated. (*Id.*) Plaintiff testified that he was going blind and was almost completely blind in his left eye. (R. at 520–21.)

Plaintiff also testified regarding his heart conditions at the hearing. Specifically, Plaintiff noted that he has two forms of coronary artery disease from diabetes. (R. at 521.) He has eight stents in the right side of his heart. (*Id.*)

Because of the lack of feeling in his hands, Plaintiff cut his right hand and arm after putting it through a glass door. (R. at 522.) Plaintiff indicated that he could use his first finger and thumb and could grip a glass if he was able to see it. (*Id.*)

Plaintiff testified that he still retains his driver's license. (R. at 544.) He testified that he only drove to church and to the store. (*Id.*) Plaintiff reported that these drives were only a couple of miles and that he always checked his blood sugar before he left. (*Id.*)

### III. MEDICAL RECORDS

A.  <u>Physical Impairment Treatment Notes</u>

In June 2002, Plaintiff reported to the emergency room after suffering an acute myocardiac infarction. (R. at 260.) Plaintiff was transferred to Riverside Methodist Hospital to undergo cardiac catherization. (R. at 126.) The records from this incident document Plaintiff's history of hypertension and diabetes. (*Id.*) In November 2002, Plaintiff underwent another procedure, which included stent placement, and was diagnosed with coronary artery disease. (R. at 131–32.)

On August 1, 2004, Plaintiff visited the emergency room after injuring his right distal forearm. (R. at 192.) Plaintiff explained that he missed the handle of his glass door and accidently put his hand through the glass. (*Id.*) He reported numbness in his hand and difficulty

3

moving his fingers. (*Id.*) On August 1, 2004, David P. Bahner, M.D., diagnosed Plaintiff with volnar hand laceration with ulnar nerve deficit. (R. at 199.) Plaintiff had surgery for repair of the right ulner nerve and ulnary artery. (R. at 200.) Plaintiff underwent physical therapy from August 24, 2004 until September 15, 2004. (R. at 212–20.)

In July 2005, Plaintiff reported to the emergency room with a diabetic foot ulcer in the great toe of his right foot. (R. at 134.) The emergency room notes also reflect neuropathy to the mid calves at this time. (R. at 135.) Plaintiff was again hospitalized for a right toe ulcer in late August 2005. (R. at 150–52.) Plaintiff described that the blister in his right toe was the result of it rubbing against his boot. (R. at 150.) Upon admission, doctors diagnosed Plaintiff with a right toe ulcer; cellulitis; insulin dependent diabetes mellitus, uncontrolled; and chest pain. (*Id.*) During treatment there was no control in Plaintiff's blood sugars. (R. at 151.) In September 2005, Leslie Clark, M.D., diagnosed Plaintiff with a diabetic infection in his right foot and performed an open transmitted tarsal first toe amputation. (R. at 177.)

Plaintiff was hospitalized multiple times in 2006. In May 2006, Plaintiff was admitted for a diabetic foot infection. (R. at 276.) Plaintiff also complained of chest pain at this time. (R. at 277.) Douglas Rush, M.D., diagnosed Plaintiff with multiple conditions including diabetic foot infection with cellulitis and diabetic neuropathy. (R. at 273.) Dr. Douglas instructed Plaintiff to follow up at a wound care center and prescribed medication for his neuropathy. (R. at 274.) Plaintiff went to the hospital again in June 2006 for a left foot wound. (R. at 280.) He was hospitalized again on July 24, 2006 for vomiting. (R. at 282.) At this time, Plaintiff's blood glucose level was elevated at 527. (R. at 282.)

Ophthalmologist Harold F. Leeper, M.D., examined Plaintiff on January 16, 2007. (R. at

257.) Plaintiff reported decreased vision in his left eye over the past month. (*Id.*) Plaintiffs vision rated 20/400 in his left eye, 20/50 in his right. (*Id.*) Dr. Leeper's impression was proliferative diabetic retinopathy with associated edema for both eyes. (R. at 258.) Plaintiff underwent laser treatment. (*Id.*)

Plaintiff was hospitalized in February 2007 after experiencing chest pain. (R. at 284.) He was eventually diagnosed with unstable agina in addition to coronary artery disease. (R. at 355.) Catheterization demonstrated severe three vessel coronary disease. (R. at 366.) Additionally, there was significant right coronary artery calcification. (*Id.*) Plaintiff received stents at this time. (R. at 367.) Laboratory results were remarkable for poorly controlled blood sugar. (*Id.*) Plaintiff underwent a second catherization, with additional stents, on March 15, 2007. (R. at 367, 438.)

Plaintiff was admitted to the hospital again later in March 2007 for a diabetic ulcer over his foot. (R. at 411–25.) The discharge summary for this visit noted "wasting of the small vessels of the right hand in flexion of the little finger, ring finger, and middle finger." (R. at 411.) Diagnostic imaging revealed a fracture at the base of the fifth metatarsal. (R. at 419.) An echocardiogram demonstrated "[f]air left ventricular function with ejection fraction of 40-50%." (R. at 417.)

Plaintiff returned to the hospital in April 2007. (R. at 288–98.) At this time, Plaintiff "presented with sepsis secondary to a right diabetic foot ulcer." (R. at 288–89.) An MRI revealed "extensive cellulitis throughout the entire mid and forefoot extending to the dorsal aspect of the hindfoot on the right." (R. at 289.) On April 10, 2007, Plaintiff underwent right foot transmetatarsal amputation. (*Id.*)

Finally, the records contain treatment notes from David Ray, D.O., Plaintiff's primary care physician. In July and October of 2006, Plaintiff reported fluctuating blood sugars. (R. at 497.) In March 2007, Plaintiff reported chest pain that appeared to come with stress and anxiety. (R. at 496.) On June 27, 2007 Plaintiff complained of dizzyness and passing out when standing up. (R. at 495.) Dr. Ray noted that Plaintiff's blood pressure was not necessarily orthostatic when Plaintiff stood up. (*Id.*) In July 2007, Plaintiff was doing reasonably well except for pain in his foot. (R. at 494.)

B.  Mental Impairment Treatment Notes

Plaintiff received psychiatric treatment from Patricia Gainor, M.D., until at least June 2007. (R. at 502–07.) Plaintiff had been taking Cymbalta, but reported that it was not helping his depression much. (*Id.*) Dr. Gainor diagnosed Plaintiff with major depression. (R. at 507.) Dr. Gainer continued to prescribe Cymbalta and diagnose depression through the remainder of her treatment notes. (R. at 502–05.) In November 2006, Dr. Gainor also began prescribing Seroquel. (R. at 503.)

C.  Evaluations

1.  Dr. Chlorechok

J. Chlorechok, M.D., completed an assessment form regarding Plaintiff on September 15, 2004. (R. at 211.) Dr. Chlorechok opined that Plaintiff's ability to sit and stand throughout a normal workday was not affected. (*Id.*) Dr. Chlorechok further opined that Plaintiff was capable of lifting no more than five pounds. (*Id.*) Additionally, Dr. Chlorechok found Plaintiff to be extremely limited in the areas of pushing/pulling, reaching, and handling. (*Id.*)

6

2. <u>Dr. Tripathi</u>

Raj R. Tripathi, M.D., performed a consulting examination and evaluation of Plaintiff on October 19, 2004. (R. at 221–28.) Dr. Tripathi noted that Plaintiff suffered from chest pain and occasional back pain, and had recently suffered an injury to his right hand. (R. at 222.) Dr. Tripathi observed minimal swelling in the right wrist and hand, as well as fixed flexion deformity of the third, fourth, and fifth finger at the proximal interphalangeal joint. (R. at 222, 224.) Dr. Tripathi felt that Plaintiff's right hand was unusable for manipulation. (*Id.*)

In assessing Plaintiff's work-related abilities, Dr. Tripathi felt that Plaintiff could sit, stand, and walk for four to six hours. (R. at 224.) Furthermore, Dr. Tripathi opined Plaintiff could lift and carry approximately twenty to twenty-five pounds with his left hand. (R. at 224.)

3. <u>Dr. Cui</u>

Examining physician Luke XL Cui, M.D., completed an evaluation form assessing Plaintiff's abilities on October 15, 2005. (R. at 186–88.) Dr. Cui diagnoses included uncontrolled insulin dependent diabetes, diabetic foot ulcer, and diabetic neuropathy. (*Id.*) In terms of limitations, Dr. Cui opined that Plaintiff could not be expected to stand or walk during an eight hour workday. (R. at 188.) Dr. Cui further opined that Plaintiff could only lift up to five pounds. (R. at 188.)

4. <u>Dr. Gainor</u>

On April 9, 2007, Dr. Gainor wrote a letter concerning Plaintiff's mental limitations. (R. at 426.) She emphasized that despite his physical and mental conditions, he was still trying to perform odd jobs. (*Id.*) Dr. Gainor opined that Plaintiff's depression keeps him from being able to work. (*Id.*) Specifically, she maintained that Plaintiff does not react well to pressure in any

7

setting and cannot stand the stress of a full workday. (*Id.*) Dr. Gainor offered similar opinions in a follow-up letter on October 5, 2007. (R. at 498–99.)

      5.      <u>Dr. Ray</u>

On September 25, 2007, Dr. Ray wrote a letter concerning Plaintiff's health status. (R. at 501.) After summarizing Plaintiff's impairments, Dr. Ray opined that Plaintiff "would be expected to have weakness and fatigue, which would limit him to sedentary work, at most." (*Id.*) Dr. Ray went on to state that Plaintiff "will likely never be able to perform any type of sustained meaningful work." (*Id.*)

Dr. Ray wrote a follow-up letter on October 15, 2007. (R. at 500.) He specifically stated:

> [Plaintiff] will never be able to perform gainful employment. The reasons for this . . . include fatigue, widely fluctuating glucose levels, which would interrupt even the most sedentary work and would definitely take the patient "off task" for significant periods during a normal work day, as well as [] significant limitations due to his poor circulation and his chronic pain syndrome.

(R. at 500.)

### IV. EXPERT TESTIMONY

A.     <u>Medical Expert</u>

Dr. Paul Boyce testified as a medical expert via telephone at the November 14, 2007 hearing based on his review of Plaintiff's records. Dr. Boyce began by summarizing the treatment history for Plaintiff's heart conditions. (R. at 523–24.) According to Dr. Boyce, Plaintiff's cardiac condition was a significant impairment, but did not meet or equal the requirements of any listing. (R. at 524.)

Dr. Boyce went on to summarize Plaintiff's problems with his right hand. (R. at 525.)

8

Dr. Boyce opined that the records did not adequately describe the severity of deformity in his right hand. (*Id.*) The ALJ described Plaintiff's hand for Dr. Boyce, noting that Plaintiff's third, fourth, and fifth fingers were "curled to the underside." (*Id.*) From this description, Dr. Boyce opined that Plaintiff had "significant flexion deformity." (*Id.*)

With regards to Plaintiff's diabetes, Dr. Boyce noted that the record did not contain a significant amount of discussion. (R. at 526.) Dr. Boyce found that there was some evidence of neuropathy. (*Id.*) Although Dr. Boyce observed that the record was somewhat unclear as to the exact nature of Plaintiff's lower extremity problems, he noted that Plaintiff had undergone a trans-metatarsal amputation of his right foot. (R. at 526–27.) Dr. Boyce mentioned that the record demonstrated a severe visual impairment in Plaintiff's left eye. (R. at 528.) There was also evidence of some peripheral vascular disease. (*Id.*)

Although Dr. Boyce was unable to conclude that Plaintiff met a listing requirement, he did find Plaintiff's work capacity significantly reduced, especially since 2007. (*Id.*) Ultimately, Dr. Boyce opined that from his onset date until early 2007 Plaintiff would be capable of "total lifting using both upper extremities of 20 pounds occasionally, 10 pounds frequently." (R. at 529.) Dr. Boyce also listed several postural limitations. (R. at 529–30.) According to Dr. Boyce, Plaintiff had no restrictions reaching over his head, but he would not be capable of handling objects with his right hand while reaching overhead. (R. at 530.) Accordingly, Plaintiff would "have to grasp anything overhead with his left hand only." (*Id.*) Nor would Plaintiff be able to perform fine manipulation with his right hand. (*Id.*) Dr. Boyce felt that Plaintiff was capable of gross manipulation with his right hand if his left hand assisted. (*Id.*)

After 2007, Dr. Boyce opined that Plaintiff's standing or walking would be limited to two

hours a day, with no restrictions on sitting. (R. at 532.) Dr. Boyce felt that the same restrictions would apply to Plaintiff's hands as before 2007. (*Id.*) In terms of vision, Dr. Boyce noted a lack of depth perception because of significant vision loss to the left eye. (*Id.*)

In response to questioning from Plaintiff's attorney, Dr. Boyce testified that the record did not clearly document that Plaintiff was experiencing widely fluctuating glucose levels. (R. at 533.) Dr. Boyce did note that some evidence of the record suggested "occasional blood sugars" when Plaintiff was in duress. (*Id.*) Dr. Boyce further stated that incidents of blackout would be consistent with significantly low blood sugar levels. (R. at 534.) Finally, Dr. Boyce found that there was no clear indication from the record of an increase in neuropathy in Plaintiff's hands since early 2007. (R. at 534–35.)

B.    Vocational Expert

Suman Srinivasan testified as a vocational expert at the administrative hearing. Mr. Srinivasan classified Plaintiff's past work as a production welder, medium and unskilled, and as an auto body repairer, medium and skilled.

The ALJ proposed a hypothetical younger person with a GED and the pre-2007 limitations Dr. Boyce described in his testimony. In addition to weight limitations mirroring Dr. Boyce's restrictions, the ALJ described Plaintiff's upper extremity limitations as follows:

> No overhead reaching with the right upper extremity. Any overhead reaching would have to be done with both arms. There would be no fine manipulation on the right. However the left would not be restricted on fine manipulation. Handling of objects would be done in a gross manner with the left arm and hand being used as an assist to the right.

(R. at 540.) Mr. Srinivasan concluded that such a person could not perform Plaintiff's past

relevant work. After some clarification,[1] Mr. Srinivasan testified that such a person could perform 4,000 jobs at the light unskilled level in the Southwest Ohio region, including an information clerk and a parking lot cashier. (R. at 541.) At the sedentary level, Mr. Srinivasan testified that the hypothetical person could perform 1,500 jobs, including a surveillance system monitor. (R. at 542.) The ALJ then added the post-2007 limitations to standing, walking, and vision that Dr. Boyce assigned. (R. at 542.) Mr. Srinivasan concluded that these restrictions would not alter the job numbers he provided. (R. at 542–43.)

Plaintiff's counsel asked Mr. Srinivasan to consider someone who could only use his or her opposable thumb and index finger, in the dominant hand. (R. at 546–57.) Ultimately, Mr. Srinivasan opined that such limitations might reduce the number of available light jobs to 2,000 and the number of available sedentary jobs to 450. (R. at 554.)

## V. ADMINISTRATIVE DECISION

The ALJ issued his decision on June 18, 2008. At the first step of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity

---

[1] In response to Mr. Srinivasan's questions, the ALJ made clear that Plaintiff could not perform overhead reaching with his right hand alone and that any overhead reaching must be done with both hands in combination with the left hand and arm primarily doing the reaching. (R. at 541.)

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing

since July 31, 2004. (R. at 26.)

      Next, the ALJ found that Plaintiff had the following several severe impairments:

> Insulin dependent diabetes mellitus with neuropathy; status-post partial foot amputation on the right; residuals from status-post right hand and arm injury with surgical repair of tendons (2004); coronary artery disease, heart attack x2, status-post heart catheterization with multiple stent placement (2002 and 2007); and diabetic retionpathy, with left eye blindness (2007).

(R. at 26.) The ALJ then determined that Plaintiff's impairments did not meet or medically equal the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 29.)

      At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC"). The ALJ found:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work . . . [e]xcept walking/standing is limited to 2 hours in an eight hour day; sitting limited to 4 hours in an eight hour day. He is limited to lifting up to 10 pounds frequently; 20 pounds occasionally, but must use both hands. He should never crawl, climb ladders, ropes or scaffolds, or work around hazards such as unprotected heights or hazardous machinery; no over head reaching with the right extremity; no fine manipulation with right hand; gross manipulation on the right requires the left hand for assistance; he should avoid cold temperatures below 20 degrees due to his neuropathy; and no work that requires depth perception because of blindness in one eye.

(R. at 29.) The ALJ concluded that while Plaintiff's impairments could reasonably be expected to cause his alleged symptoms, he was not credible with regard to the intensity, persistence, and

---

                of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.     Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.     Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

limiting effect of his symptoms to the extent his statements were inconsistent with the assigned RFC. (R. at 30.) In reaching this determination, the ALJ explicitly noted that the limitations that Dr. Tripathi set forth were consistent with his RFC. (R. at 31.) The ALJ gave little weight to the opinions of Drs. Gainor and Ray. (*Id.*)

Finally, relying on the testimony of Mr. Srinivasan, the ALJ found that Plaintiff is capable of successfully adjusting to a significant number of jobs in the national economy.[3] (R. at 32.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 14.)

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must

---

[3] The ALJ applied the 4,000 light and 1,500 sedentary figures that Mr. Srinivasan testified to based on the original hypothetical question.

13

"'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the Commissioner's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

Within his Statement of Errors, Plaintiff sets forth multiple issues. For example, Plaintiff contends that the ALJ's hypothetical question did not accurately account for Plaintiff's mental and physical impairments. For the reasons that follow, the undersigned agrees that the ALJ's hypothetical question did not fully account for the RFC limitations he ultimately assigned. Accordingly, substantial evidence does not support the Commissioner's decision. Furthermore, from a procedural standpoint, the ALJ did not sufficiently articulate his reasoning with regards to Plaintiff's alleged mental impairment.

A.   <u>Hypothetical Question</u>

It is "'well established an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact.'"

*Carrelli v. Comm'r Of Soc. Sec.*, 390 F. App'x 429, 438 (6th Cir. 2010) (quoting *Casey v. Sec'y of Health and Hum. Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). "'In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments.'" *Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 865 (6th Cir. 2011) (quoting *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010); *see also Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 118 (6th Cir. 2010) ("If the ALJ relies on a vocational expert's testimony in response to a hypothetical to conclude that the claimant is capable of performing a number of jobs, the hypothetical question must describe the claimant in all significant, relevant respects.").

In this case, the ALJ relied on the vocational expert's testimony in concluding that Plaintiff could adapt to a significant number of jobs in the economy. (R. at 32.) The ALJ's hypothetical question, however, did not adequately account for all of the limitations within the RFC he assigned. Although Plaintiff emphasizes his hand impairments in arguing for error,[4] a

---

[4] There does appear to be at least some tension with regards to Plaintiff's hand injury within the ALJ's decision and the vocational expert testimony. Within his analysis of Plaintiff's severe impairments, the ALJ concluded that Plaintiff "has lost use of the last three fingers of his right hand with no manipulation ability . . . ." (R. at 27.) In assigning an RFC, however, the ALJ generally tracked Dr. Boyce's opinion, which Dr. Boyce based on the record and a verbal description of Plaintiff's hand, allowing for gross manipulation with the right hand with assistance of the left hand. (*See* R. at 29, 532.) The vocational expert testified to a hypothetical question based on Dr. Boyce's conclusions as to Plaintiff's right hand ability. Nevertheless, the vocational expert also suggested that if Plaintiff was incapable of any use of the last three fingers on his right hand, this would further narrow job availability. (*See* R. at 545–56.) At the end of the November 2007 administrative hearing, the ALJ discussed potentially re-contacting Dr. Boyce to further clarify Plaintiff's right hand limitations. (R. at 556.) There is no indication within the ALJ's written decision that this occurred. Because other reasons support remand, it is unnecessary to ultimately decide whether the ALJ committed an error as to this issue. The undersigned, however, encourages the Commissioner to reconsider this issue on remand.

much starker inconsistency exists in the record.  While it appears the ALJ's RFC was partially based on Dr. Boyce's testimony, it was also based on the opinion evidence of Dr. Tripathi. Within this opinion evidence, Dr. Tripathi found Plaintiff capable of sitting four to six hours in a workday.  (R. at 224.)  The ALJ's RFC adopted a conservative version of this finding, concluding Plaintiff's "sitting [was] limited to [four] hours in an eight hour day."  (R. at 29.) The ALJ also noted in his decision that his RFC was consistent with Dr. Tripathi's opinion evidence.  (R. at 30–31.)  The vocational expert testimony, however, did not account for any sitting limitation.  (*See* R. at 540–42.)  Rather, the hypothetical questions the vocation expert considered appear to be based on the testimony of Dr. Boyce, who concluded "[s]itting still no restrictions."[5]  (R. at 532; *see also* R. at 529.)

Furthermore, from the jobs the vocational expert provided, it is highly likely that this sitting restriction will have an affect on the availability of positions.  Accordingly, the undersigned is unwilling to find the ALJ's omission irrelevant.  To the extent the ALJ finds this limitation credible within his RFC, he must account for it for it in his hypothetical question.

Based on the inconsistency between the ALJ's RFC and hypothetical question in this case, substantial evidence does not support the Commissioner's ultimate non-disability finding. Accordingly, even assuming the ALJ properly evaluated the opinions of the treating physicians, remand is necessary for clarification of the record and re-evaluation of the evidence.[6]

---

[5] The ALJ's written decision mistakenly contends that Dr. Boyce limited Plaintiff to sitting for four hours in an eight hour day.  (R. at 28.)  Dr. Boyce did indicate that another doctor restricted Plaintiff's sitting, but Dr. Boyce "didn't see any limitations . . . of sitting or standing" prior to 2007, and after that period noted "[s]itting still no restrictions."  (R. at 529, 532.)

[6] Accordingly, the undersigned will not reach the treating physician issues Plaintiff raises at this time.  As the Commissioner is aware, however, if he rejects the opinions of

16

B.     Articulation

Within his statement of errors, Plaintiff also faults the ALJ for failing to adequately consider his mental impairments. The undersigned agrees that the ALJ has committed procedural error in his regard.

As the United States Court of Appeals for the Sixth Circuit has recently noted, an ALJ's decision "must include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.'" *Reynolds v. Comm'r of Soc. Sec.*, No. 09–2060, 2011 WL 1228165, at *4 (6th Cir. Apr. 1, 2011) (quoting 5 U.S.C. § 557(c)(3)(A)). At step two of the sequential analysis, an ALJ is required to consider whether the claimant has severe impairments of either a physical or mental nature. 20 C.F.R. §§ 404.1520, 416.920. The Sixth Circuit has emphasized that the second step is a "*de minimus* hurdle" and has found that "if an impairment has 'more than a minimal effect' on the claimant's ability to do basic work activities, the ALJ must treat it as 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576–77 (6th Cir. 2009). Furthermore, "[o]nce one severe impairment is found, the combined effect of all impairments must be considered, even if other impairments would not be severe." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190 (6th Cir. 2009) (internal quotations omitted) (holding that an ALJ erred in not considering a claimant's non-severe mental impairments in assessing her RFC); *but see Nejat*, 359 F. App'x at 578 ("[W]hen an ALJ considers all of a claimant's impairments in the remaining steps of the disability

---

Plaintiff's treating physicians, his reasons "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (internal quotations omitted).

determination, an ALJ's failure to find additional severe impairments at step two does not constitute reversible error.").

In this case, it is simply unclear based on the ALJ's articulation whether he adequately accounted for Plaintiff's mental impairments in assessing his RFC. Plaintiff's treating psychiatrist, Dr. Gainor, treated Plaintiff from at least April 2006 until June 2007, diagnosing him with major depression. Dr. Gainor also offered opinions as to Plaintiff's work ability, ultimately concluding Plaintiff's depression was disabling. In his written decision, however, the ALJ omitted depression from his discussion of Plaintiff's severe impairments and provided no analysis of mental impairments. (*See* R. at 27–29.) Such an omission may not have been procedural error had the ALJ accounted for Plaintiff's mental limitations in his RFC. The ALJ, however, did not account for Plaintiff's mental impairment. The ALJ's RFC analysis provides only a brief description of why he gave Dr. Gainor's opinions little weight.[7] This analysis is focused on rejecting Dr. Gainor's opinions, and does not provide any firm indication that the ALJ accounted for Plaintiff's depression in assigning his RFC. This is not to say that the ALJ was required to accept the severity of Dr. Gainor's opinion or even provide a more restrictive RFC. Under the circumstances of this case, however, the ALJ was required to provide sufficient analysis to indicate that the RFC accounted for Plaintiff's mental impairments.

C.      Remand is Necessary

Because the Commissioner erred in its decision, the undersigned must decide whether to

---

[7] The ALJ rejected her opinion because "[t]here is no longitudinal record of treatment and there are no signs and symptoms of depression noted in the record." (R. at 31.) This reasoning is difficult to square with of Dr. Gainor's treatment notes in the record from April 2006 until June 2007, in which she frequently diagnosed Plaintiff with depression and prescribed him medication for the condition. (R. at 502–05.)

remand or reverse for an award of benefits. The United States Court of Appeals for the Sixth Circuit has emphasized that " [i]f a court determines that substantial evidence does not support the Secretary's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Hum. Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). In other terms, "[a] judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Id.*

In this case, there is a significant portion of evidence indicating that Plaintiff may be disabled. Nevertheless, as the Commissioner points out, at least some evidence in the record conflicts on the subject. Furthermore, some of the opinions from medical sources touch on issues reserved to the Commissioner. Under these circumstances, remand for reconsideration, and rehearing if necessary, is appropriate.

## VIII. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **REMAND** this case to the Commissioner for further consideration consistent with this Report and Recommendation.

## IX. NOTICE

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: August 3, 2011                                          /s/ *Elizabeth A. Preston Deavers*
                                                                                   Elizabeth A. Preston Deavers
                                                                                  United States Magistrate Judge